2026 IL App (1st) 250087-U

No. 1-25-0087

First Division
July 20, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JADE MAESTAS, as Independent Executor of the Estate of MARINA MAESTAS, Deceased, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| | ) | No. 20 L 8271 |
| v. | ) ) | |
| UNION PACIFIC RAILROAD COMPANY, a foreign corporation, and ERIC JOHNSEN, | ) ) ) | Honorable Thomas V. Lyons II, Judge, Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court did not err in denying plaintiff's motion for a new trial where (1) the jury's noneconomic damages award was not manifestly inadequate; (2) it was harmless error to admit into evidence the videotaped discovery deposition of a controlled expert; (3) there was no error in the jury instructions; (4) defendants did not violate the court's rulings on two motions *in limine*; and (5) defendants did not elicit improper testimony on mental health care. The jury's verdict is affirmed.

¶ 2    This action stems from a collision in Wheaton, Illinois, involving Marina Maestas, deceased, and a ballast regulator owned by defendant-appellee Union Pacific Railroad Company (Union Pacific) and operated by Union Pacific's employee, defendant-appellee Eric Johnsen. Following a two-week trial, the jury found in favor of plaintiff-appellant Jade Maestas, independent executor of Marina's estate, on her claims of negligence, ruled against her on her claims of willful and wanton conduct, and awarded her $1.9 million in survival and wrongful death damages. The award was reduced by 38% to account for Marina's contributory negligence. Plaintiff appeals from the jury's verdict and the trial court's denial of her posttrial motion, arguing that the trial court erred: (1) in allowing the videotaped discovery deposition of defendants' expert, Dr. Croft, to be converted into an evidence deposition and played at trial; (2) by instructing the jury on section 1201 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-1201 (West 2024)); (3) in denying plaintiff a new trial on damages where the jury's award was against the manifest weight of the evidence; (4) in denying plaintiff a new trial on damages due to defendants' violation of two motions *in limine* rulings during closing argument; and (5) by failing to cure improper testimony elicited of a witness by defense counsel regarding mental health care in violation of the Mental Health and Developmental Disabilities Confidentiality Act (Confidentiality Act) (740 ILCS 110/1 *et seq.* (West 2024)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On July 29, 2020, a collision occurred involving Marina and a Union Pacific ballast regulator operated by a Union Pacific employee, Eric Johnsen, at the Union Pacific Washington Street railroad crossing in Wheaton, Illinois.

¶ 5    On August 5, 2020, Marina filed a complaint in the circuit court of Cook County, asserting claims of premises liability, negligence, and willful and wanton conduct against Northeast Illinois

Regional Commuter Railroad Corporation d/b/a Metra (hereinafter, "Metra"), Union Pacific and Johnsen. On September 5, 2020, Marina passed away.

¶ 6    On January 5, 2021, plaintiff, Marina's daughter, who was appointed independent executor of Marina's estate, filed an amended complaint at law, asserting wrongful death and survival claims against the same defendants on the same theories of liability.

¶ 7    On January 19, 2021, Metra filed a motion for summary judgment, asserting that it does not own, operate, maintain, or control the railroad crossing or its signal equipment at the site of the incident and owed no duty of care to plaintiff. On March 3, 2021, plaintiff filed a motion to voluntarily dismiss without prejudice Metra as a defendant. On March 5, 2021, the court granted plaintiff's motion and Metra was dismissed.

¶ 8    On February 22, 2024, plaintiff filed the operative second amended complaint. Therein, she asserted wrongful death and survival claims for negligence and willful and wanton conduct against defendants Union Pacific and Johnsen. As to negligence, plaintiff alleged that Union Pacific: "[a]llowed the ballast regulator to be used when it knew or should have known its railroad track equipment shunted tracks erratically causing a ballast regulator not to activate crossing signals, including the gates, lights and sirens at the Washington Street railroad grade crossing"; failed to post a flagman to warn vehicles of the ballast regulator's approach; failed to educate operators of ballast regulators that "its railroad track equipment shunted tracks erratically causing ballast regulators not to activate crossing signals"; "[p]ermitted and/or allowed railroad equipment" over the railroad crossing despite knowing that warning devices were not functioning properly; failed to repair the crossing signals at the railroad crossing; failed to maintain the ballast regulator in a reasonably safe condition with a functional speedometer; and failed to implement and enforce certain policies and procedures. As to willful and wanton conduct, plaintiff alleged

that Union Pacific: allowed Johnsen to operate the ballast regulator despite knowing that these machines did not activate crossing signals; allowed Johnsen to operate the ballast regulator without a speedometer; failed to post a flagman at the railroad crossing; and failed to repair the mechanism that activated crossing signals at the railroad crossing despite knowing that its equipment did not consistently activate the crossing signals. She alleged that these actions "exhibited an utter indifference or conscious disregard for public safety, including Marina Maestas."

¶ 9    Prior to trial, the parties filed numerous motions *in limine*. Relevant to this appeal, plaintiff's motion *in limine* no. 24 sought to exclude from trial references to the "wealth, poverty, or the pecuniary circumstances of the parties" in order to prevent defendants from asking about plaintiff's "annual income and ownership of property or other inquiries related to [p]laintiff's financial status." Defendants' motion *in limine* no. 2 sought to preclude plaintiff from commenting "upon the size or wealth of Union Pacific[,]" emphasizing "the corporate nature of Union Pacific," and attempting "to arouse any bias or prejudice of the jurors against corporations," because doing so would encourage the jury "to treat the railroad corporation differently from an individual[.]" On February 21, 2024, the trial court granted both of these motions.

¶ 10    The jury trial commenced in March 2024.

¶ 11    During the trial, Dr. Steven Croft, M.D., a controlled expert for defendants, fell seriously ill and he was unable to testify on Union Pacific's behalf either in person or remotely. On March 11, 2024, defendants presented a sworn affidavit stating as much. The court acknowledged the affidavit and remarked that the trial should not be suspended for an indefinite period of time based on Dr. Croft's illness. Plaintiff's counsel noted before the court that the evidentiary rules did not permit discovery depositions to be admitted into evidence for controlled experts. Nonetheless, the court found that Dr. Croft was unavailable under extenuating circumstances and permitted Dr.

Croft's testimony to be presented through the videotaped discovery deposition conducted by plaintiff's counsel. The parties were directed to select the necessary parts of the depositions to be read to the jury, and the court would rule on any objections afterwards.

¶ 12    We now provide the extent of evidence presented at trial as is necessary for resolution of this appeal. We note that the transcripts for the trial, including some of the videotaped evidence depositions, do not appear to be complete; however, the transcripts included in the record are sufficient for resolution of the issues on appeal.

¶ 13    Plaintiff first called Johnsen as an adverse witness. He testified that, as an employee of Union Pacific, he operated on-track equipment, which maintains the tracks. He agreed that the on-track equipment was equipped with devices called shunts, which activate the gates and lights at a crossing. On July 29, 2020, Johnsen was operating a ballast regulator and traveling from Chicago to Lombard, along with Jeremy Jones and Jose Medina, to do surfacing work. In the "surfacing gang" was: a Hy-Rail truck (a modified pickup truck that can travel on railroad tracks), operated by Jones; a ballast regulator (a machine used to shape and redistribute the gravel track ballast supporting the ties in the railroad tracks) operated by Johnsen; and a tamper (a rail-mounted machine used to pack the track ballast under the tracks), operated by Medina. The Hy-Rail truck was at the front of the gang, with the ballast regulator in the middle and the tamper at the end.

¶ 14    Johnsen testified that, as he approached the Washington Street railroad crossing in Wheaton, he could not recall whether he used the horn equipped on the ballast regulator, but he confirmed that an operator is required to use the horn when approaching a crossing. He was prepared to stop as he approached the crossing but was unable to stop before entering the crossing. He also testified that the gates were rising just before entering the crossing and he was more than 150 feet behind the Hy-Rail truck. Johnsen confirmed that there was no speedometer in the ballast

regulator but that the manual for the equipment requires a speedometer. Johnsen denied that he had been informed during his training that shunts on the ballast regulator, which is a device to activate the gates and lights at an upcoming crossing, were not always effective. Finally, Johnsen admitted that he violated Union Pacific's internal Maintenance of Way Rule 42.6, which stated that on-track equipment must be prepared to stop at all crossings, must yield the right-of-way to vehicular traffic, and should proceed only when all lanes are visible and it is safe to do so.

¶ 15      Johnsen was then examined by defense counsel. He testified that he had not previously had any brake or signal issues with the ballast regulator he was driving on the day of the incident, and he had been operating this same ballast regulator for three months. He further testified that he had made that crossing on the ballast regulator at least a dozen times prior to the collision and there had never been any signal issues prior to that day. On the day of the incident, he inspected the machine and performed a stopping test prior to starting the assigned job. He testified that the gang passed eleven crossings before reaching Washington Street, and there had been no signal issues at any of them. When he approached the Washington Street crossing, he observed the gates were down and there were cars stopped; however, before entering the crossing, he observed the gates rising and immediately began braking. He did not believe that Marina applied the brakes at all as she entered the crossing, and he felt as though the time between the gates rising to impact was almost instantaneous. After the impact, he stopped the machine and contacted the Union Pacific dispatcher, who was responsible for stopping all other train activity and contacting emergency services. He then exited the ballast regulator, looked into Marina's car, and observed that she was unconscious. Johnsen testified that he was in shock after the accident. Finally, he testified that there was nothing additional he could have done to prevent the accident.

¶ 16     Anthony Bernhard, previously the director of safety for engineering for Union Pacific, testified that his position required him to ensure that Union Pacific's tracks, rules, and procedures complied with federal regulations. He agreed that the purpose of bunching, where the on-track equipment maintain a distance of 50 feet from each other, is "to visually simulate a train" and better notifies the public that the gang is coming through the crossing. He confirmed that bunching and posting a flagman would prevent the risk of a car hitting a piece of on-track equipment. He agreed that Union Pacific's training provided that operators should not rely on the shunting of a machine at a crossing. Finally, Bernhard agreed that Johnsen violated Rule 42.6 "because he was not prepared to stop or yield the way to oncoming traffic[.]"

¶ 17     On cross-examination, Bernhard testified that there is not a rule requiring a group of on-track equipment like this one to bunch together at crossings and there is no federal regulation that coincides with Rule 42.6. He further testified that Johnsen violated the rule because he was going at such a speed that he would not be able to stop to yield to traffic.

¶ 18     Brian McCormick, a signal maintenance manager for Union Pacific, testified that ballast regulators, and other on-track equipment, have the potential to shunt the tracks erratically, meaning the gates and lights at the crossing are not activated.

¶ 19     Jeremy Jones, who was driving the Hy-Rail truck on the day of the collision, testified that, during travel mode, as opposed to work mode, they must maintain a distance of at least 300 feet from other on-track equipment, but he did not know the significance of the precise distance. Jones estimated that Johnsen was approximately .2 to .25 miles (1,041 to 1,326 feet) behind him when Jones approached the Washington Street crossing. He testified that there was no issue with this distance as they were encouraged as employees "to extend our travel distance whenever possible." He testified that he had traveled through the Washington Street crossing hundreds of times in a

Hy-Rail truck and had never experienced an issue with the signals or gates at that crossing. On redirect examination, Jones testified that, in his training courses, he had been advised that on-track equipment can shunt erratically and that the shunts should not be relied on to activate the lights and gates at a crossing.

¶ 20    Marilyn Lange, a resident of Wheaton, Illinois, testified that she was familiar with the Washington Street railroad crossing and she lived 1.7 miles away from it. She testified that, on July 29, 2020, she was driving home and was on the north side of the tracks, the opposite side from Marina. Upon approaching the crossing, the gates were down, the lights were flashing, and there was already a car stopped in front of her. She observed a truck pass through the crossing and then the gates on both sides began to rise. As she was waiting to start driving again, she observed Marina's car "starting to cross the tracks" on the other side and "all of a sudden, it was like a blink, this other vehicle came flying by on the tracks and hit the car and pushed it down the tracks." She also observed that, right after the collision, the car in front of her began to "reverse back to its spot in front of me." Because of that, she believed that that car must have started to approach the crossing after the gates went up. Lange also testified that, at the time that Marina's car began to cross the tracks, the gates were up. Finally, she testified that, when she had observed maintenance vehicles on the railroad tracks on prior occasions, "[t]hey typically travel closer together going the same speed, and the gates then stay down as they travel in a pack."

¶ 21    Jason Mendenhall testified that, on the day of the incident, he was at the crossing in his car, and Marina was in the car in front of him. He observed the second piece of equipment continuing down the railroad tracks towards the crossing, but the warning lights had stopped flashing and the gates were no longer down. He testified that the ballast regulator was proceeding at the same pace as the Hy-Rail truck that had already passed through the crossing. He testified

that he honked his horn "a few times" and the driver of the car on the other side of the crossing was flashing their lights "as [Marina] was crossing over the tracks." Mendenhall was in a truck and was "positioned higher" than Marina's car, and he did not observe her look left or right before approaching the railroad tracks. He also testified that he could see the driver of the ballast regulator, he "didn't see him looking in the direction he was facing, going[,]" and he "did not notice any action taken by the operator as [Marina] was crossing the intersection[.]" On cross-examination, he testified that he saw the ballast regulator at least a quarter mile away. He saw the equipment approaching the tracks and "noticed that the gates [were not] coming down as she was starting to cross the tracks[.]" He agreed that there was nothing to obstruct the view of a large machine coming down the tracks and the ballast regulator was plainly visible. He further testified that Marina could have avoided the accident had she looked left and subsequently braked, but he also stated that if the gates were down that also would have prevented the accident. Finally, he testified that, when the collision occurred, there was a loud, hard impact, and the ballast regulator pushed the car down the tracks some distance.

¶ 22    Adam Welte, a police officer with the Wheaton Police Department, testified that, on the day of the collision, he received a call and he went to the scene and secured the area. He spoke with Johnsen, who informed him that, as he was traveling east towards the crossing, he observed the gates begin to rise and Marina's car went underneath the rising gate across the tracks when the collision occurred.

¶ 23    Twyla Mitchell, an officer with the Metra Police Department, testified that she was one of the investigating officers for this accident. She spoke with Johnsen on the scene, and he informed her that he was traveling 5 miles per hour and, as he was entering the crossing, the gates were up and the lights were not activated. He also stated that he applied the brakes upon impact with the

vehicle. On cross-examination, Mitchell's vest camera was played, showing her conversation with Johnsen. She agreed that the video showed that Johnsen did not mention the lights, and he stated that he was "already on the brake" upon impact.

¶ 24    Samantha Culafic, a paramedic, testified that Marina was given a dose of fentanyl for pain management immediately after the incident.

¶ 25    George Gavalla, an expert in the field of railroad safety, explained various aspects of federal regulations pertaining to railroad crossings and the Manual of Uniform Traffic Control Devices, which "sets design standards" for railroad crossings. He further explained that the crossing signal system records data, similar to a black box, and he analyzed the recorded data from the Washington Street Crossing. He testified that, on the day in question, the warning signals had been activated 116 seconds prior to the Hy-Rail truck entering the crossing, which suggested an "activation failure" to him because the prescribed warning time was 27 seconds for that crossing. He further explained that the data showed that the crossing gates began to rise after the Hy-Rail truck left the crossing and the gates were in the upright position five seconds later. Less than a second later, the system detected another train or other rail equipment approaching the crossing. Five seconds later, the ballast regulator reached the "island circuit" of the crossing, approximately 50 feet from the road, and almost at the same time, the crossing signals were activated and the gates began to descend. Gavalla confirmed that the gates were in an upward position when the ballast regulator was 50 feet from the road, contrary to Johnsen's testimony that the gates began to rise as he entered the crossing.

¶ 26    On cross-examination, he testified that he had no issue with the detection system at the Washington Street crossing, the signals were designed properly, the incident did not involve a malfunction, and it was not the result of a signal maintenance issue. He testified that it was an

"interference as opposed to what's defined as a malfunction." He further confirmed that, except for approximately two-tenths of a second, the lights were flashing and the bells were ringing from the time the Hy-Rail truck activated the signal until after the collision occurred. He also agreed that the gates began to descend less than a second before the ballast regulator reached the "island circuit" of the crossing.

¶ 27 Brian Hansen, a railway engineering consultant and expert, testified that the surfacing gang on the day of the accident failed to bunch their machines up to 50 feet apart and doing so would have been a visual signal to drivers that they were coming through a crossing. He also testified that on-track equipment should "be moving at a slow enough speed that you can stop short of any obstructions" and it does not matter whether the gates for the crossing are up or down. In his expert opinion, the ballast regulator operator "failed to approach the Washington Street crossing prepared to yield the right-of-way of vehicular traffic and failed to stop in half a distance seen to be clear." He further testified that "ballast regulators specifically tend to have erratic and unstable shunting; meaning, that they will shunt the track and bring the gates down, but for whatever reason, part way to the crossing oftentimes the crossing gates will come back up." Because of this, he explained that ballast regulator operators should be "looking for the gates to come up" and "whether or not somebody enters a crossing[.]" He also testified that having a flagger at that crossing would have prevented the collision.

¶ 28 On cross-examination, Hansen confirmed that the Washington Street crossing and the five preceding crossings were within a half mile from each other. In his opinion, Jones should have stopped his Hy-Rail truck before entering the first of those six crossings to allow the rest of the gang to catch up so they could go "through all of the crossings completely as one unit[.]" Hansen

also agreed that, [a]s far as we know," everything was working properly at all of the preceding crossings that day.

¶ 29    Jennifer Gresko Schevers testified that she previously lived in Wheaton, Illinois, on the grounds of the Theosophical Society. She met Marina and plaintiff in 2002 when they moved to the society. She testified that she had a close relationship with Marina for several years, and her son was friends with plaintiff when they were children. She further testified that, from her perspective as a longtime neighbor, plaintiff and Marina had a "[v]ery close" and "connected" relationship. On cross-examination, Schevers testified that she is a licensed clinical professional counselor with a master's degree in counseling psychology. She testified that she did not provide counseling to plaintiff following the death of her mother because "that's not [her] role[,]" but she did provide plaintiff with a referral for a counselor. She did not know the outcome of her referral because it was "not [her] right to know."

¶ 30    In addition to Schevers, Norine Houtz (Marina's sister), John Difford (plaintiff's boyfriend), Linda Dorr (a volunteer at the Theosophical Society), and Janet Kerschner (Marina's coworker) each testified about Marina and plaintiff's mother-daughter relationship from their perspectives.

¶ 31    Dr. Harold Bach IV, M.D., testified that he was Marina's trauma surgeon at Good Samaritan Hospital. His testimony was presented to the jury via a videotaped evidence deposition. Dr. Bach first observed Marina on July 30, 2020, at which time Marina was not in acute distress and was intubated and sedated, and her Glasgow Coma Scale (GCS) score was 5 because she was not opening her eyes. When he observed her on August 6, 2020, he noted that she still had a breathing tube in place, was not opening her eyes, did not follow commands, and withdrew to painful stimulus, such as a pinch, on all four extremities. His notes on August 9, 2020, indicated

that Marina was not in acute distress and she was awake. On August 12, he observed that Marina was not in acute distress, was responsive only to pain, had a breathing tube in place, and only opened her eyes to painful stimuli. On August 15, he noted that she still had the breathing tube, was opening her eyes and squeezing hands on command, and was otherwise stable. On August 22, Dr. Bach noted that Marina was sleepy, opened her eyes to vocal stimuli, and was on a feeding tube. He also noted that she would transition to rehab soon, suggesting that Marina was stable. On August 26, Dr. Bach observed that Marina was opening her eyes but could not follow commands. She was then discharged from Good Samaritan. On cross-examination, Dr. Bach testified that his notes from July 30, 2020, indicated that Marina was "being given Fentanyl, which is a narcotic pain medication, and she was being given propofol, which is an anxiolytic or a sedative medication." On August 6, 9, and 15, his notes indicated that Marina was receiving Tylenol for her pain. Dr. Bach confirmed that, on August 22, he noted that Marina was not in acute distress and was not sedated, and on August 26, he also noted that she was not in acute distress.

¶ 32    Dr. Michael Wemhoff, M.D., whose testimony was presented via a videotaped evidence deposition, testified that he is a neurosurgeon who treated Marina at Good Samaritan Hospital from July 29 to August 14. When Dr. Wemhoff first came into contact with Marina on July 29, it was discovered that she had intracranial hemorrhaging, and he performed surgery, specifically, a craniotomy, on her that day. He also treated her cervical fractures by keeping her in a hard neck brace or collar and later a "halo traction vest," which provided additional external stabilization. On August 9, Dr. Wemhoff performed surgery on her cervical spine for the implantation of screws and rods for internal stabilization. Dr. Wemhoff testified that, "[w]hen she first came in, she did have a very *** depressed level of consciousness[.]" He also testified that, during her hospitalization, Marina's condition improved and she was able to follow simple commands. On

cross-examination, Dr. Wemhoff agreed that, based on his progress notes, he was not aware of Marina experiencing any acute distress.

¶ 33 Dr. Paul Vana, M.D., a trauma and acute care surgeon, testified that he was treating Marina at Good Samaritan Hospital as part of the trauma team and also as the critical care intensivist. His notes indicated that, on July 31, 2020, Marina was on a "fentanyl drip" for "pain control." In his note dated August 4, he indicated that "[t]he fentanyl drip is now off with no change in the patient's neuro status." Dr. Vana's note from August 27 was part of Marina's discharge summary and it indicated that Marina was unable to speak but was able to follow commands and she was discharged to a skilled nursing facility that day in "fair" condition. On cross-examination, Dr. Vana testified that none of his notes from July 31 to August 27 indicate that Marina was ever in acute distress or had experienced any acute events.

¶ 34 Dr. Peter Salgo, M.D., a retained expert in anesthesiology, reviewed Marina's medical records, various depositions, and the autopsy report in forming his opinions. He explained that Marina suffered injuries to her skull, brain (including brain hemorrhages and a brain bleed), and back, she fractured her pelvis, ribs, and clavicle, and she had additional injuries to her lower extremities (including an ankle fracture) and facial lacerations and fractures. He stated that "[m]edically each of these injuries is excruciatingly painful." He further testified that Marina would have been experiencing pain for 10 to 15 minutes while waiting to be extricated from her car after the collision. Prior to surgery, she was given a small dose of fentanyl, which, according to Dr. Salgo, would have reduced, but not eliminated, her pain. He testified that, during her hospitalization, "she was aware enough to experience pain and suffering" and she could not be given "enough medication to eliminate the pain from these injuries without dropping the blood pressure to a point where you're going to harm the patient." He also testified that, while she was

in the hospital, she was paralyzed on one side of her body, she had a tube in place to breathe, she was fed with a feeding tube, she could not speak, and she was "awake enough to appreciate" that "things that give us pleasure in life" had been taken away from her. He testified that the nurses' notes indicated that Marina responded to painful stimuli throughout her hospitalization. According to Dr. Salgo, Marina later developed several infections, lost weight, and developed pancreatitis, which is "extreme[ly] pain[ful." Eventually, she died of pneumonia, bacteremia, and other long-term consequences from the collision. The autopsy showed that Marina died as a result of the injuries she sustained in the crash. On cross-examination, Dr. Salgo agreed that, after her initial presentation to EMTs and in the emergency room, there was no documentation showing Marina was in acute distress. He confirmed that he had no criticisms of the pain management Marina received from her treating physicians.

¶ 35    Following Dr. Salgo's testimony, there was a discussion between the parties and the court regarding defense counsel's prior cross-examination of Schevers as to psychiatric care. In particular, plaintiff's counsel stated, "We've never made a claim for psychiatric care in this case." He further described the issue as "left hanging out there" as to whether plaintiff received any psychiatric care, and he stated, "We've never waived the *Reda*[.]" Plaintiff's counsel then suggested two options "to cure" the issue for the jury: "Either that testimony gets stricken or [plaintiff] just answers I had had care, and it should end there because we've never made the claim. We're not going to make the claim." The court ruled that "the more appropriate thing is one question: Have you sought professional counseling as a result of this? Yes. And leave it there." The court denied defense counsel's request to ask whether plaintiff was seeking psychological damages.

¶ 36    The parties stipulated that Marina's medical bills amounted to $617,459.73.

¶ 37    Plainitff testified as to her relationship with Marina and described her as her "closest confidante" whom she trusted "the most in the world." The jury was shown numerous photographs of her and Marina, and she recounted several memories. She further testified as to her experience while Marina was hospitalized and how Marina's loss affected her. On cross-examination, plaintiff was asked, "Since this accident have you sought any type of grief counseling?", and she answered in the affirmative.

¶ 38    On March 11, 2024, after plaintiff completed her case-in-chief, defendants filed a motion for a directed verdict, which the trial court denied.

¶ 39    The defense first called Richard Campbell as a witness. Campbell testified that he is employed by an engineering firm and his area of expertise was in grade crossing safety, engineering, and design. He also testified that he is a consultant for the Federal Railroad Administration. He confirmed that the lights stopped flashing at the crossing for two-tenths of a second before turning back on, which is just longer in duration than "a blink of an eye but not much." He confirmed that there was not a design, manufacturer, or maintenance malfunction in the system, and he testified that, contrary to Gavalla's testimony, interference was not a factor in the collision. Additionally, he testified that there was no erratic shunting in this incident. On cross-examination, Campbell agreed that a design standard from the Manual on Uniform Traffic Control Devices was violated because the gates were not down five seconds prior to the ballast regulator entering the crossing. He also agreed that the gates were in an upward position for six seconds before they began to descend once again and the gates were not down when the ballast regulator entered the crossing. He confirmed that the ballast regulator was traveling at a higher speed than the Hy-Rail truck. Finally, he agreed that, if the surfacing gang had been 50 feet away from each other, the gates would have stayed down at the crossing.

¶ 40    Daniel J. Melcher, a licensed professional engineer and an engineering expert for the defense, testified that he investigates collisions and reconstructs accidents. He testified that Marina's Honda Accord would have been traveling at a speed of 12 to 16 miles per hour at the time of impact, and the ballast regulator would have been traveling at a speed of 21 to 23 miles per hour at the time of the collision. He testified that the ballast regulator began to brake around five seconds before entering the island circuit for the crossing, and Marina's car was in motion for four seconds. He testified that the crossing gates are less visible for any operator of equipment on the railroad tracks, but "[t]here was nothing that would obstruct the ability of a Honda driver to detect and appreciate [the ballast regulator's] proximity and its approaching."

¶ 41    On cross-examination, he agreed that, at the time that the ballast regulator began to start braking, if it had been going 19 miles per hour, the regulator would have been able to stop prior to colliding with the Honda. He agreed that the gates were up for six seconds prior to impact and began to descend 1.6 seconds before impact. He also agreed that the ballast regulator was between 800 and 1100 feet behind the Hy-Rail "during this sequence of track."

¶ 42    Dr. Steven Robert Arndt, a human factors scientist, testified that "there were sufficient visual, environment, and contextual cues for [Marina] to have avoided the collision if she had been reasonably alert and attentive while driving on Washington Street" and "[f]rom a human factors perspective, [Marina's] actions were not consistent with a reasonably alert and prudent driver."

¶ 43    Dr. Steven Croft, M.D., a neurologist, testified as a controlled expert on defendants' behalf. As stated above, his testimony was presented through his videotaped discovery deposition, during which he was first questioned by plaintiff's counsel. Plaintiff's counsel first extensively questioned Dr. Croft about his professional background. Counsel then questioned Dr. Croft on his submitted expert opinion in the expert disclosure. Dr. Croft specifically testified that it would be reasonable

to say that Marina was experiencing pain shortly after the collision as evidenced by her statement, "help me," to the EMTs. He stated that her injuries were significant and typically very painful but he "believe[d] that her brain injury *** diminished her capacity to experience pain." He continued, "I think that her cognition was altered and that her pain perception was altered" between the time of the collision and when she was transported to the hospital. He also believed that her ability to perceive pain was altered during her hospitalization because she was "not exhibiting pain" He further stated that "[p]eople who are unconscious don't perceive pain" and "[s]he wasn't totally unresponsive or unconscious, so *** the degree which she was experiencing pain was blunted[.]" He testified that, in his opinion, Marina's traumatic brain injury reduced her ability to communicate with and comprehend the world around her.

¶ 44    Defense counsel then examined Dr. Croft. Dr. Croft explained that the neurologist's notes from August 5 stated that she was not sedated but she was not verbal and nonresponsive, which "indicate[d] that she was not perceiving pain to any significant degree." He also pointed out that her treating physicians "referred to her as being in no acute distress numerous times and in spite of not having pain medication on-board." When asked about the videos of Marina from plaintiff's cell phone, which Dr. Croft reviewed in forming his opinion, he responded: "I think it just helped kind of support my opinion in that [Marina] appeared to have, you know, numerous tubes and things that you find in people in the ICU, but she did not appear to be in any distress."

¶ 45    Regarding jury instructions, defendants proposed Jury Instruction 8, which quoted section 1201 of the Vehicle Code (625 ILCS 5/11-1201 (West 2024)) and read as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a statute which provided that:

Whenever any person driving a vehicle approaches a railroad grade crossing where the driver is not always required to stop, the person must exercise due care and caution as the existence of a railroad track across a highway is a warning of danger, and under any of the circumstances stated [below], the driver shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad and shall not proceed until the tracks are clear and he or she can do so safely. The foregoing requirements shall apply when:

1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train or railroad track equipment;

2. A crossing gate is lowered or a human flagman gives or continues to give a signal of the approach or passage of a railroad train or railroad track equipment;

3. A railroad train or railroad track equipment approaching a highway crossing emits a warning signal and such railroad train or railroad track equipment, by reason of its speed or nearness to such crossing, is an immediate hazard;

4. An approaching railroad train or railroad track equipment is plainly visible and is in hazardous proximity to such crossing;

5. A railroad train or railroad track equipment is approaching so closely that an immediate hazard is created.

If you decide that decedent violated this statute, then you may consider that fact together with all of the other facts and circumstances in evidence in determining whether and to what extent, if any, decedent was contributorily negligent before and at the time of the occurrence."

¶ 46   On March 12, 2024, during the jury instruction conference, plaintiff objected to that instruction, arguing that the statute did not apply to the facts of the case because Marina was

required to stop at the railroad crossing where the lights were flashing, the gates were down, and the bells were ringing. The court found the statute applicable and agreed to give the proposed instruction to the jury.

¶ 47    The court also instructed the jury as to contributory negligence. Specifically, in instructing the jury as to plaintiff's claim that Marina was injured and sustained damage as a result of defendants willful and wanton conduct, the court provided that:

"The defendants claim that [Marina] was contributorily negligent in one or more of the following respects:

(a) failed to keep a proper lookout;

(b) failed to heed operating luminous flashing lights and warning bells;

(c) failed to stop and remain clear of the railroad tracks when the clearly visible and audible electric signal devices warned of the immediate approach of the ballast regulator;

(d) failed to stop and remain clear of the railroad tracks when the approaching ballast regulator was clearly visible and in hazardous proximity to the railroad crossing;

(e) failed to stop and remain clear of the railroad tracks when the ballast regulator was approaching so closely that an immediate hazard was created;

(f) ignored the warning provided by the crossing warning bell and flashing red lights and entered the grade crossing despite the warning provided;

(g) entered the grade crossing without looking to determine if any on-track equipment was approaching, despite the risk of death or injury by doing so; and

(h) was otherwise negligent."

¶ 48    Also relevant here, the court instructed the jury, at the outset, that: "Your verdict must not be based upon speculation, prejudice, or sympathy. Each party, whether a corporation or an individual, should receive your same fair consideration."

¶ 49    During closing arguments, plaintiff's counsel requested approximately 50 million dollars in survival and wrongful death damages. Defense counsel made the following statements that are pertinent to this appeal:

"Again of course I asked several times is there anybody that has a problem with large corporations or with railroads. And so when you're deliberating, somebody can't say, yeah, but this is a big railroad so or, yeah, but this is a big company so. If you do that then you are violating this and you're prejudging an issue based on the parties and not upon the facts of the case.

***

[I]t says each party whether a corporation or an individual should receive the same fair consideration. So if anyone says, hey, I'm going to rule against Union Pacific because it's a big company, you've violated that instruction."

Defense counsel also stated:

"The damages that we heard this morning are staggering for the facts of this case.

***

You saw about a half dozen times in the plaintiff's closing the Union Pacific's logo constantly reminding you that there's a company involved in this lawsuit. But you have to put your natural sympathy aside. The jury instructions require you to treat a company the same as you would treat an individual.

***

The jury instructions say you must treat a company in the same way that you treat an individual. So let's keep that in mind. If this were a lawsuit and the parties were individuals knowing that a 1.65 seconds [Marina] still could have stopped and applied the brakes and completely avoided this incident, you would never be thinking in terms of numbers anywhere close to the staggering numbers you heard earlier. If this were a case and there were just individuals involved, you would probably be in the jury room about twenty minutes and come back. Union Pacific is made up of hardworking men and women who work hard every day to do a good job."

Plaintiff did not object to any of these statements.

¶ 50    On March 13, 2024, the jury was recessed to deliberate at approximately 2 p.m. On March 14, 2024, at about 4:30 p.m., the jury returned a verdict in favor of plaintiff on her negligence claims in the amount of $1,938,000 but found in defendants' favor on the willful and wanton conduct claims. The award included $80,000 for plaintiff's grief, sorrow, and mental suffering, and $35,000 for plaintiff's loss of society. On the survival claims, the jury awarded Marina's estate $350,000 for her disability, $500,000 for her pain and suffering, $250,000 for emotional distress, $618,000 for reasonable and necessary medical expenses, and $100,000 for disfigurement damages. The jury found Marina 38% at fault for the collision and reduced the award to $1,201,560. On December 23, 2024, the trial court amended the judgment to award plaintiff an additional $195,139.88 in prejudgment interest, $5,100.65 in costs, and $85,325 in postjudgment interest.

¶ 51　On May 1, 2024, plaintiff filed a motion for posttrial relief, requesting a new trial or, in the alternative, an *additur* of the jury award or new trial solely on damages. Her claims of error raised in the motion are the same as those raised on appeal here.

¶ 52　On December 19, 2024, the trial court denied the motion. Regarding the damages award, the judge stated that he "was somewhat surprised at the size of the verdict" and that "[t]he award for some of the non-economic damages was lower than [he was] accustomed to seeing with injuries of this type." The judge later added, "[I]t is not my role to invade the province of the jury and second-guess what they thought[,]" but plaintiff has "good reason to be disappointed in the award." Regarding the jury instruction issue, the court stated that it interpreted that statute as "this is the type of crossing where the driver is not always required to stop. [Marina] would not always be required to stop at this crossing." For that reason, the court "gave the instruction." Regarding Dr. Croft's discovery deposition, the court explained that plaintiff was aware that Dr. Croft was unavailable, and the parties agreed to proceed in this manner. The court also stated that it "went to great lengths to make sure the case was tried on the merits and that both sides received a fair trial[.]" Regarding the mental health privilege violation, the court stated that the curative question was adequate and suggested by plaintiff's counsel. Regarding closing arguments, the court stated that "this is the opposite situation of what *** those motions were seeking" and the comments did not rise "to the level of warranting a new trial."

¶ 53　This timely appeal followed.

¶ 54　　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 55　In this appeal, plaintiff argues that the trial court erred: (1) in allowing the videotaped discovery deposition of defendants' expert, Dr. Croft, to be converted into an evidence deposition and played at trial; (2) by instructing the jury on section 1201 of the Vehicle Code (625 ILCS 5/11-

1201 (West 2024)); (3) in denying plaintiff a new trial on damages where the jury's award was against the manifest weight of the evidence; (4) in denying plaintiff a new trial on damages due to defendants' violation of two motions *in limine* rulings during closing argument; and (5) by failing to cure improper testimony elicited of a witness by counsel regarding mental health care in violation of the Confidentiality Act (740 ILCS 110/1 *et seq.* (West 2024)).

¶ 56                                  A. Jury Damages Award

¶ 57    Because many of plaintiff's arguments relate to her assertion that the jury's damages award was "objectively low," we address first her general request for an *additur* of the jury's award or a new trial on damages. She contends that the verdict is manifestly inadequate in light of the testimony at trial of her and Marina's close mother-daughter relationship.

¶ 58    The determination of damages is a question of fact that is firmly within the jury's discretion. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 247 (2006). A jury's verdict will only be overturned on appeal if it is against the manifest weight of the evidence. *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 355 (2010). "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." (Internal quotation marks omitted.) *Id.* But, the court's decision on a motion for a new trial will not be reversed absent an abuse of discretion. *Id.* at 355-56. Thus, in assessing whether the court abused its discretion, this court must consider whether the jury's verdict was supported by the evidence. *Id.* at 356. "[W]here there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." *Maple v. Gustafson*, 151 Ill. 2d 445, 456 (1992).

¶ 59     Although, generally, the damages award is within the discretion of the jury, a new trial may be warranted where the damages are "manifestly inadequate or if it is clear that proved elements of damages have been ignored or if the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff." *Id.* "Absent a clear indication in the record that the jury failed to follow some rule of law or considered some erroneous evidence, or that the verdict was the obvious result of passion or prejudice, a reviewing court will not upset the jury's assessment of damages." *Tri-G, Inc.*, 222 Ill. 2d at 247. "A jury's award will not be found to be against the manifest weight of the evidence merely because it can be characterized as less than generous." *Branum v. Slezak Construction Co., Inc.*, 289 Ill. App. 3d 948, 953 (1997). Further, "mere dissatisfaction does not require a new trial on damages[.]" *Id.* Finally, we "exercise[ ] all reasonable presumptions in favor of the verdict, and the verdict is not legally inconsistent unless it is absolutely irreconcilable." *Tedeschi v. Burlington Northern R.R. Co.*, 282 Ill. App. 3d 445, 448-49 (1996).

¶ 60     In the instant case, plaintiff requested that the jury award her $21,300,000 for her grief, sorrow, and mental suffering upon her mother's death and the same amount for her loss of society, for a total of $42.6 million. The jury's instructions related to noneconomic damages provided that the jury must "fix the amount of money which will reasonably and fairly compensate [plaintiff] for the pecuniary loss proved by the evidence to have resulted to her" and "the law recognizes a presumption that the daughter has sustained some substantial pecuniary loss by reason of [her mother's] death." The instructions also explained that pecuniary loss "may include loss of money, benefits, goods, services, and society." Additionally, the instructions stated that the jury "may consider what the evidence shows concerning" plaintiff's loss of society, plaintiff's grief, sorrow, and mental suffering, plaintiff and Marina's relationship with one another, the instruction, moral training, and superintendence of education that Marina might have provided to plaintiff had she

lived, and Marina's age and health. The instructions defined "society" as "the mutual benefits that each family member receives from the other's continued existence, including love affection, care, attention, companionship, comfort, guidance, and protection." The jury ultimately awarded plaintiff $80,000 for her grief, sorrow, and mental suffering and $35,000 for her loss of society, for a total of $115,000. In her posttrial motion, she argued that this amount was "exceptionally low and against the manifest weight of the evidence[.]" The trial court denied the motion, although we acknowledge that the court observed that the award was "somewhat surpris[ing]" and "lower than [he was] accustomed to seeing with injuries of this type." Regardless, the court declined to "second-guess" the jury's decision as to damages.

¶ 61    After reviewing the record, we find that the damages award was not manifestly inadequate, and the trial court's denial of the posttrial motion was not an abuse of discretion. There is no indication from the record that the jury failed to follow a rule of law, that its verdict was the result of passion or prejudice, or that a proved element of damages was ignored. Here, the jury instructions set forth the appropriate law as related to the jury's determination of damages, and "[t]he jury is presumed to follow the instructions given to it by the court." *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 40. Nothing in the record suggests that the jury disregarded the instructions. Additionally, plaintiff presented multiple witnesses to testify about her and Marina's close mother-daughter relationship, as well as testimony from multiple witnesses, including herself, as to the effects of the loss of Marina. However, we note that there was no evidence presented of any specific loss of money or other economic loss resulting from Marina's death. As the instructions stated, it was for the jury to determine "what the evidence show[ed]" as to the pecuniary loss, and it is the jury's role to assess the weight of the witnesses' testimony. *Nilsson v. NBD Bank of Illinois*, 313 Ill. App. 3d 751, 761 ("the jury is free to determine the

credibility of witnesses and to assess the weight accorded to their testimony"). We find no legal basis upon which to conclude that the jury's award was unreasonable. Thus, we are not inclined to disturb the jury's damages award. See *Carter v. Chicago & Illinois Midland Ry. Co.*, 130 Ill. App. 3d 431, 437 (1985) (where the "jury is properly instructed *** and has a reasonable basis for its award, a reviewing court will not, and should not, disturb its verdict"). As such, we cannot say that the jury's award was "palpably inadequate" merely because "it was less than generous." *Gruidl v. Schell*, 166 Ill. App. 3d 276, 283 (1988).

¶ 62    We find *Dobyns v. Chung*, 399 Ill. App. 3d 272 (2010), instructive here. In that case, the jury awarded the plaintiff $100,000, reduced by 50% due to the deceased's contributory negligence, and the plaintiff appealed, arguing that the trial court should have granted his request for an *additur* or a new trial on damages. *Id.* at 273. The Fifth District of this court noted that "the jury was presented with a host of evidence regarding [the deceased's] physical and mental health" and "evidence of the close familial ties between [the deceased], her widower, and her teenaged sons, along with their feelings of grief and loss[.]" *Id.* at 288. The court then found that the damages awarded by the jury were not "manifestly inadequate or contrary to the evidence." *Id.* In doing so, the court also stated that "[i]t is not within our province to substitute our judgment for that of the jury to determine the monetary value of the loss of society in this case." *Id.* Although wrongful death damages "cannot be measured by comparison with other verdicts[,]" we find that *Dobyns* supports our conclusion that the jury's award of $115,000 in wrongful death damages was not manifestly inadequate. *Id.* at 287.

¶ 63    In a few cases, this court has held that the jury's award for noneconomic damages was manifestly inadequate. See, *e.g.*, *Hollis v. R. Latoria Construction, Corp.*, 122 Ill. App. 3d 290, 297 (1983) ($6,000 to compensate the plaintiff "for his loss of future earnings, his past and future

pain and suffering, and his disability and disfigurement resulting from the injury" was manifestly inadequate); *Stamat v. Merry*, 78 Ill. App. 3d 445, 448 (1979) ($1,753.90 to compensate the plaintiff for his pain and suffering and resulting disability, *i.e.*, extensive facial fractures and permanent double vision and loss of feeling in his face, bore "no relation to the injuries suffered by this plaintiff"); *Long v. Bennett*, 55 Ill. App. 3d 50, 52 (1977) ($8,000 was inadequate wrongful death compensation for the decedent's estate). However, the amounts awarded in those cases for noneconomic damages, such as pain and suffering and permanent disabilities, were trivial in comparison to the amount awarded here. Comparatively speaking, the noneconomic damages awarded in this case, although less than plaintiff's expected amount, cannot be construed as trivial.

¶ 64    We similarly conclude that an *additur* was not warranted under these circumstances. The doctrine of *additur* allows, in appropriate cases, the trial court to order a new trial "based on the inadequacy of damages unless the defendant consents to an increase in the award of damages." *Merrill v. Hill*, 335 Ill. App. 3d 1001, 1006 (2002). Application of this doctrine is only appropriate "to rectify the omission of a liquidated or easily calculated item of damages[.]" *Id.* Noneconomic damages such as pain and suffering cannot be considered an "easily calculated item" or a liquidated asset. Thus, *additur* would not be appropriate in this instance, especially where the courts "are neither trained nor equipped to second-guess those judgments about the pain and suffering and familial losses incurred by other human beings." *Barry v. Owens-Corning Fiberglass Corp.*, 282 Ill. App. 3d 199, 207 (1996).

¶ 65    Dissatisfaction with the jury's damages is not reason enough to grant plaintiff an *additur* or new trial on damages. See *Branum*, 289 Ill. App. 3d at 953. "Reviewing courts rarely disturb jury awards[,]" and we decline to do so in this case. *Barry*, 282 Ill. App. 3d at 207; see *Nilsson*, 313 Ill. App. 3d at 762 ("[D]amages are the jury's prerogative, not the appellate courts'.").

¶ 66                    B. Expert's Videotaped Discovery Deposition

¶ 67    Next, plaintiff argues that she is entitled to a new trial on damages because the trial court

erred in permitting defendants to play the videotaped discovery deposition of Dr. Croft. Plaintiff

asserts that this error seriously prejudiced her right to a fair trial where she was unable to cross-

examine Dr. Croft and affected the outcome of the jury's award of damages. In response,

defendants contend that the court's decision to allow the discovery deposition of Dr. Croft to be

presented to the jury was reasonable given the extenuating circumstances, and even if it was an

error, it was a harmless one.

¶ 68    Generally, this court reviews evidentiary rulings, such as this one, for an abuse of

discretion. *White v. Advocate Condell Medical Center*, 2026 IL App (1st) 240450, ¶ 145. "An

abuse of discretion occurs 'only when the trial court's ruling is arbitrary, fanciful, unreasonable,

or where no reasonable person' would take the trial court's view." *Id.* (quoting *Hoffman v.

Northeast Illinois Regional Commuter R.R. Corp.*, 2017 IL App (1st) 170537, ¶ 41).

¶ 69    Illinois Supreme Court Rule 212 (eff. Oct. 1, 2020) distinguishes between evidentiary and

discovery depositions. "The purpose of a discovery deposition is to explore the facts of the case,"

and, therefore, "wide latitude is given in the scope and manner of questioning." *In re Estate of

Rennick*, 181 Ill. 2d 395, 401 (1998). In contrast, the purpose of an evidentiary deposition is to

preserve testimony for trial, and "questioning is therefore limited by the rules of evidence." *Id.*

Discovery depositions constitute hearsay and "generally are not admissible at a trial even when

the deponent is unavailable because it would inhibit free discovery by requiring evidentiary

objections at discovery depositions." *Browning v. Advocate Health and Hospital Corporation*,

2023 IL App (1st) 221430, ¶ 52. However, Rule 212(a) provides five circumstances in which a

discovery deposition may be used.

¶ 70    Relevant here, subsection (5) provides that a discovery deposition may be used:

"upon reasonable notice to all parties, as evidence at trial *** against a party who appeared at the deposition or was given proper notice thereof, if the court finds that *the deponent is not a controlled expert witness*, the deponent's evidence deposition has not been taken, and the deponent is unable to attend or testify because of death or infirmity, and if the court, based on its sound discretion, further finds such evidence at trial *** will do substantial justice between or among the parties." (Emphasis added.) Ill. S. Ct. R. 212(a)(5).

¶ 71    Notably, Illinois Rule of Evidence 804(b) (eff. Jan. 1, 2011) sets forth the permitted exceptions to the rule against hearsay evidence. In particular, the rule allows former testimony given as a witness "in a discovery deposition as provided for in Supreme Court Rule 212(a)(5)." Ill. R. Evid. 804(b)(1) (eff. Jan. 1, 2011).

¶ 72    We agree with plaintiff that the admission of Dr. Croft's videotaped discovery deposition was a violation of Rule 212. Dr. Croft's unavailability and the reasonableness of the trial court's decision under the extenuating circumstances are irrelevant because the rule quite clearly does not allow for a discovery deposition to be used where the deponent is a controlled expert witness, like Dr. Croft in this case. Although the court's ruling may have seemed reasonable to the court under the particular circumstances, it was nonetheless erroneous and contrary to Rule 212. Because Rule 212(a)(5) is not applicable here, the admission of Dr. Croft's discovery deposition also violated evidentiary rules barring hearsay testimony where no exception applied.

¶ 73    However, we nonetheless conclude that it was not reversible error. "[R]eversal requires finding that the error caused substantial prejudice and affected the outcome of the trial." *Browning*, 2023 IL App (1st) 221430, ¶ 64. "We will not reverse if it is apparent that 'no harm has been done.' " *Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39 (quoting *Jackson*

*v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991)). In this case, plaintiff has the burden of establishing prejudice and that the error affected the trial's outcome. See *id.* Significantly, "[w]hen erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless." *Greaney v. Industrial Commission*, 358 Ill. App. 3d 1002, 1013 (2005).

¶ 74    After reviewing the record, we find that the admission of the discovery deposition had little if any prejudicial effect on plaintiff's right to a fair trial or the award of damages where (1) plaintiff's counsel had the opportunity to cross-examine Dr. Croft during the discovery deposition; (2) plaintiff has not offered any examples of what additional questions were to be asked had Dr. Croft been a live witness; and (3) the testimony was largely cumulative of other properly admitted testimony as to Marina's pain and suffering as a result of the collision.

¶ 75    Plaintiff's counsel extensively probed Dr. Croft as to his professional background, as well as each of Dr. Croft's stated opinions from his expert disclosure regarding Marina's ability to experience pain. Further, plaintiff has failed to state a single question that would have been asked had Dr. Croft testified as a live witness. Without any specific examples from plaintiff, it is unclear how additional cross-examination would have affected the jury's award of damages, which we have previously concluded was not manifestly inadequate.

¶ 76    Moreover, Dr. Croft's testimony was largely cumulative. For instance, Dr. Salgo, the anesthesiologist expert, testified that Marina was not in acute distress during her hospitalization, he had no criticisms of the treating physicians' pain management, and Marina was sedated to various degrees throughout her hospitalization. Additionally, Dr. Wemhoff, Marina's treating neurosurgeon, testified that she had a "depressed level of consciousness" due to her brain injuries and he did not observe Marina to ever be in acute distress during her hospitalization. He further testified that Marina was, at various points of her hospitalization, given fentanyl and Tylenol to

reduce any pain. Dr. Bach, Marina's trauma surgeon, also testified that none of his records indicated that Marina had been in acute distress at any point, even when she was not sedated. Dr. Vana's testimony similarly evidenced that Marina was never in acute distress. Our reading of the record leads us to the conclusion then that Marina's ability to experience pain, or lack thereof, was sufficiently proven through other competent evidence. Accordingly, plaintiff cannot demonstrate prejudice on this record which shows that Dr. Croft's testimony was cumulative of other properly admitted evidence.

¶ 77    Thus, we conclude that admission of this evidence was not reversible error. See *Browning*, 2023 IL App (1st) 221430 (finding harmless error where the discovery depositions of seven treating physicians were admitted at trial as substantive evidence).

¶ 78                                   C. Jury Instructions

¶ 79    Third, plaintiff argues that the trial court erred in instructing the jury as to section 1201 of the Vehicle Code (625 ILCS 5/11-1201 (West 2024)), where plaintiff maintains that this statute was not applicable to the collision at hand. Plaintiff further contends that this instruction seriously prejudiced her right to a fair trial because it provided credibility to defendants' arguments that Marina was contributorily negligent to some degree. For this reason, she requests a new trial on liability and damages.

¶ 80    "The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence." (Emphasis omitted.) *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 507 (2002). 2013 IL App (1st) 082513-B, ¶ 119. "A trial court is required to use an Illinois Pattern Jury Instruction when it is applicable in a civil case after giving due consideration to the facts and the prevailing law[.]" *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2008). The trial court's decision to grant or deny a proposed jury instruction is

reviewed for abuse of discretion. *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶ 42. "An abuse of discretion occurs when the court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would adopt the court's view." *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28. "A new trial should not be granted because of improper jury instructions unless a party's right to a fair trial has been seriously prejudiced." *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 121 (2003). A trial court does not abuse its discretion as to jury instructions where, in their entirety, the instructions "fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273; see *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995) (stating that it is within the trial court's discretion to determine what issues have been raised by the evidence).

¶ 81    Here, the trial court provided the jury with Illinois Pattern Jury Instructions, Civil, No. 60.01 (revised Dec. 2011) (hereinafter IPI Civil (2011) No 60.01), setting forth section 1201 of the Vehicle Code. In general, the function of this pattern instruction is to inform "the jury that a statute, ordinance, or administrative regulation was 'in force at the time of the occurrence' and the jury may consider its violation as evidence of negligence." *Bulger*, 345 Ill. App. 3d at 117. The notes on the use of this instruction state that it "should be given only where the evidence would support a finding that the injury complained of was proximately caused by a violation of a statute *** intended to protect against such an injury, and that the injured party is within the class intended to be protected by the statute ***." IPI Civil (2011) No. 60.01, Notes on Use.

¶ 82    Specifically, the trial court in this case read the relevant portions of the statute to the jury and then instructed the jury that "[i]f you decide [Marina] violated this statute, you may consider that fact together with all of the other facts and circumstances in evidence *** in determining whether and to what extent, if any, [Marina] was contributorily negligent before and at the time of

the occurrence." Previously, during the jury instruction conference, plaintiff objected to this instruction, but the trial court found the statute applicable and agreed to give the proposed instruction to the jury. Plaintiff asserted this as a claim of error in a posttrial motion, which the trial court denied. We must now determine whether this instruction was properly given to the jury. Our decision depends on our interpretation of the relevant statute.

¶ 83    The following statutory construction principles guide our analysis here. In statutory interpretation, we must ascertain and give effect to legislative intent. *Blum v. Koster*, 235 Ill. 2d 21, 29 (2009). "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. The statute should be evaluated as a whole, with each provision construed in connection with every other section." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 216-17 (2008). When the statute's language is clear, we need not resort to other tools of construction. *Id.* at 217. We must not depart from the plain language "by reading into it exceptions, limitations, or conditions that conflict with the legislature's expressed intent." *MidAmerica Bank, FSB v. Charter One Bank*, 232 Ill. 2d 560, 565-66 (2009).

¶ 84    Section 1201 provides as follows:

"(a) Whenever any person driving a vehicle approaches a railroad grade crossing where the driver is not always required to stop, the person must exercise due care and caution as the existence of a railroad track across a highway is a warning of danger, and under any of the circumstances stated in this Section, the driver shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad and shall not proceed until the tracks are clear and he or she can do so safely. The foregoing requirements shall apply when:

1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train or railroad track equipment;

2. A crossing gate is lowered or a human flagman gives or continues to give a signal of the approach or passage of a railroad train or railroad track equipment;

3. A railroad train or railroad track equipment approaching a highway crossing emits a warning signal and such railroad train or railroad track equipment, by reason of its speed or nearness of such crossing, is an immediate hazard;

4. An approaching railroad train or railroad track equipment is plainly visible and is in hazardous proximity to such crossing;

5. A railroad train or railroad track equipment is approaching so closely that an immediate hazard is created." 625 ILCS 5/11-1201(a) (West 2024).

¶ 85    According to plaintiff, because Marina had stopped at the railroad crossing due to the active crossing signals, the statute did not apply to her once the gates lifted. As we explain below, we disagree with this interpretation of the statute and application to the facts.

¶ 86    Although we need not defer to the trial court's ruling on *de novo* review, we nonetheless agree with the court's interpretation of the statute. The trial court stated that the first clause in the statute referred to a type of crossing, rather than what an individual driver actually did at such crossing. The clause indicates that the requirement of "due care and caution" applies "[w]henever any person driving a vehicle approaches a railroad grade crossing where the driver is not always required to stop[.]" A railroad grade crossing where a driver is not *always* required to stop would apply to the Washington Street crossing because at that crossing a driver is not *required* to *stop* their vehicle if the gates are up and the lights and bells are not activated. In those instances, the driver, Marina in this instance, must follow this statute and must exercise due care and caution,

and if any of the enumerated situations are present, the driver must stop their vehicle between 15 and 50 feet from the crossing. The language of the statute is not ambiguous and clearly applied to this crossing and this driver.

¶ 87    We also note that plaintiff's interpretation is illogical where the statute also provides requirements for drivers to stop, as Marina initially did, in certain enumerated situations. One of those enumerated situations, namely where the crossing gates are lowered, was, in fact, the precise reason for Marina's initial stop before the crossing. Thus, the statute applied to Marina when she approached the Washington Street crossing when the gates were lowered, at which time she was required to stop, and the statute continued to apply to her, once the gates were raised, as she was required to exercise due care and caution when crossing the tracks, regardless of her earlier stop.

¶ 88    This reading of the statute is also consistent with the long-standing common law duty regarding railroad crossings. See *Advincula v. United Blood Services*, 176 Ill. 2d 1, 21-22 (1996) (common law, which has been "arranged into a logical system of doctrine, principles, rules and practices, furnishes one of the most reliable backgrounds" for statutory construction); see also *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 443 (1992) (in ascertaining the legislature's intent, "common law precedents" may be considered). In 1928, the supreme court acknowledged the rule that "it is the duty of persons about to cross a railroad track to look about them and see if there is danger, and not to go recklessly upon the track, but to take proper precaution to avoid accident." *Greenwald v. Baltimore & O.R. Co.*, 332 Ill. 627, 631 (1928). The court repeated this same duty in 1978, stating: "It is well established that railroad crossings are dangerous, and that in approaching them a person is required to diligently use the senses of sight and hearing and to exercise a degree of care commensurate with the known danger." *National Bank of Bloomington v. Norfolk & W. Ry. Co.*, 73 Ill. 2d 160, 169 (1978). This duty was eventually

codified as section 1201, which was "designed for the protection of human life and property." *Hamilton v. Atchison, Topeka & Sante Fe Ry. Co.*, 175 Ill. App. 3d 758, 760 (1988). The common law rules for railroad crossings, therefore, indicate a staunch requirement upon the public to exercise due care and caution when crossing railroad tracks, which aligns with our interpretation that the statute was applicable to Marina under these circumstances.

¶ 89    We have determined that the statute was applicable under these circumstances, but the evidence presented at trial must also be "adequate to support a finding that a violation occurred" for this instruction to be appropriate. *Brannen v. Seifert*, 2013 IL App (1st) 122067, ¶ 77. Notably, "[t]he threshold for giving an instruction in a civil case is 'not a high one.' " *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 549 (2008) (quoting *Heastie v. Roberts*, 226 Ill. 2d 515, 542 (2007)). Here, there was evidence presented that Marina did not look in either direction, *i.e.*, she did not exercise due care and caution, before proceeding across the railroad tracks. There was also evidence that the ballast regulator was plainly visible and was either in hazardous proximity to the crossing or was an immediate hazard. In either of those situations, Marina would have been required to stop before the crossing pursuant to section 1201. Finally, there was evidence presented that the warning lights stopped for two-tenths of a second, which would have been almost imperceptible to a person, and thus, Marina may have also been required to stop under the statute due to the clearly visible signal device. As an aside, although we note that there was evidence to support a finding of a violation of the statute, the factual determination as to whether there was in fact a violation was firmly within the province of the jury. See *Paulison v. Chicago, M., St. P. and P. R. R., Inc.*, 74 Ill. App. 3d 282, 292 (1979) ("It was for the jury to decide if a driver would be required by this statute to stop under the facts of this case."). Because there was sufficient evidence in the record that Marina may have violated this statute, the court did not abuse its discretion in

giving this instruction or denying plaintiff's motion for a new trial as to this issue. See *Leonardi*, 168 Ill. 2d at 101 ("All that is required to justify the giving of an instruction is *** some evidence in the record to justify the theory of the instruction.").

¶ 90                                    D. Violation of *In Limine* Rulings

¶ 91    Fourth, plaintiff argues that defendants' violated two *in limine* rulings during closing argument by raising the issue of Union Pacific's wealth as a corporation which deprived her of a fair trial. In response, defendants contend that plaintiff forfeited this claim of error by failing to object during defendants' closing argument, defendants did not violate the *in limine* orders, and, if there was a violation, plaintiff was not seriously prejudiced thereby.

¶ 92    Generally, counsel is given wide latitude during closing argument. *Magna Trust Company v. Illinois Central Railroad*, 313 Ill. App. 3d 375, 396 (2000). However, a motion *in limine* allows a party to obtain a pretrial order prohibiting certain commentary during closing argument. *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 871 (2004). Improper comments that violate a motion *in limine* is not *per se* reversible error "unless the party has been substantially prejudiced." *Magna Trust Company*, 313 Ill. App. 3d at 395; *Boren v. The BOC Group, Inc.*, 385 Ill. App. 3d 248, 257 (2008) ("An improper insinuation during closing argument that violates an *in limine* order can be the basis for a new trial.").

¶ 93    We review a trial court's ruling on a motion for a new trial for abuse of discretion, and we likewise review rulings "concerning the prejudicial impact of improper comments made during closing argument, including violations of *in limine* orders," for abuse of discretion. *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 57. Again, "[a]n abuse of discretion occurs when the court's ruling is arbitrary, fanciful or unreasonable or where no reasonable person would adopt the court's view." *McHale*, 2015 IL App (1st) 132625, ¶ 28. The trial court is afforded this deference on these

issues because it " 'heard the comments and arguments and observed the effect of those remarks upon the jury and was in a better position to measure the prejudicial effect, if any, of defense counsel's remarks.' " *Id.* (quoting *Carlasare v. Wilhelmi*, 134 Ill. App. 3d 1, 7 (1985)).

¶ 94    Before assessing defense counsel's remarks, we must first address defendants' assertion that plaintiff forfeited this claim on appeal. The record clearly shows that plaintiff's counsel did not object to any of the alleged improper comments. Failure to object to comments made during closing argument is considered forfeiture of that claim of error. *Jones v. Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1134 (2000); see *Village of Park Forest v. Walker*, 64 Ill. 2d 286, 302 (1976) (where no objection was made to counsel's impermissible remark, the claim of error was waived); *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 898 (2010) (the defendant's "failure to object [during opening statement]—whether intentional or unintentional—deprived the trial court of the opportunity to rule on any allegedly objectionable argument" and the claim was therefore unpreserved); *Duffy v. Midlothian Country Club*, 135 Ill. App. 3d 429, 438 (1985) (the defendants' argument that plaintiff's counsel impermissibly "stressed the wealth and power" of the business enterprise during closing arguments was waived where the defendants' failed to object at the time the comments were made). Nonetheless, occasionally, reviewing courts have considered unpreserved claims of improper statements during closing argument "to the extent such statements prevented a fair trial." *Zoerner v. Iwan*, 250 Ill. App. 3d 576, 585 (1993); see *City of Quincy v. V.E. Best Plumbing & Heating Supply Co.*, 17 Ill. 2d 570, 577 (1959) (stating that the court may consider unpreserved claims of error "to the extent that the *** litigant cannot receive a fair trial and the judicial process cannot stand without deterioration"). In the instant case, we conclude that the challenged remarks were neither improper nor resulted in an unfair trial.

¶ 95    Plaintiff claims that the following comments during defendants' closing argument were improper:

"The damages that we heard this morning are staggering for the facts of this case.

\*\*\*

The jury instructions say you must treat a company in the same way that you treat an individual. So let's keep that in mind. If this were a lawsuit and the parties were individuals knowing that a 1.65 seconds [Marina] still could have stopped and applied the brakes and completely avoided this incident, you would never be thinking in terms of numbers anywhere close to the staggering numbers you heard earlier. If this were a case and there were just individuals involved, you would probably be in the jury room about twenty minutes and come back. Union Pacific is made up of hardworking men and women who work hard every day to do a good job."

¶ 96    We find that these remarks were not improper because they do not clearly violate the trial court's *in limine* rulings. See *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 107 (*in limine* violation must be clear). The trial court granted plaintiff's motion *in limine* no. 24, which sought to exclude references to the "wealth, poverty, or the pecuniary circumstances of the parties" in order to prevent defendants from asking about plaintiff's "annual income and ownership of property or other inquiries related to [p]laintiff's financial status[,] and defendants' motion *in limine* no. 2, which sought to preclude plaintiff from commenting "upon the size or wealth of Union Pacific[,]" emphasizing "the corporate nature of Union Pacific," and attempting "to arouse any bias or prejudice of the jurors against corporations," because doing so would encourage the jury "to treat the railroad corporation differently from an individual[.]"

¶ 97    Defense counsel made zero reference to plaintiff or Marina's financial status. Moreover, defendants' motion sought to preclude *plaintiff* from referencing Union Pacific's size; it did not preclude defendants' from doing so. And, in any case, we cannot see how Union Pacific referencing its own size and acknowledging that it is a corporate entity would be prejudicial to plaintiff. Notably, defendants point out that plaintiff referred to Union Pacific as a "big corporation" in counsel's opening statement, which violated the motion *in limine* prohibiting plaintiff from remarking on Union Pacific's size. It is certainly arguable that plaintiff, therefore, opened the door to these remarks from defense counsel, who only sought to combat plaintiff's own violation of the court's *in limine* ruling. See *Wine v. Bauerfreund*, 155 Ill. App. 3d 19, 26 (1987) (when a party opens the door to an issue, which will result in prejudice to the opposing party, the opposing party is permitted to introduce contradictory or explanatory evidence, although it might otherwise be improper).

¶ 98    Additionally, plaintiff has only cherry-picked isolated statements, but we must view defense counsel's closing argument in its entirety and in context. *McCarthy v. Union Pacific Railroad Company*, 2022 IL App (5th) 200377, ¶ 81 (quoting *People v. Caffey*, 205 Ill. 2d 52, 131 (2001)). In addition to the remarks set forth above, defense counsel also stated:

> "Again of course I asked several times is there anybody that has a problem with large corporations or with railroads. And so when you're deliberating, somebody can't say, yeah, but this is a big railroad so or, yeah, but this is a big company so. If you do that then you are violating this and you're prejudging an issue based on the parties and not upon the facts of the case.

\*\*\*

[I]t says each party whether a corporation or an individual should receive the same fair consideration. So if anyone says, hey, I'm going to rule against Union Pacific because it's a big company, you've violated that instruction.

\*\*\*

You saw about a half dozen times in the plaintiff's closing the Union Pacific's logo constantly reminding you that there's a company involved in this lawsuit. But you have to put your natural sympathy aside. The jury instructions require you to treat a company the same as you would treat an individual.

\*\*\*

The jury instructions say you must treat a company in the same way that you treat an individual. So let's keep that in mind."

¶ 99    Viewed in context, defense counsel's remarks, although they referenced Union Pacific's size as a big corporation, clearly sought to reiterate to the jury that both parties, regardless of their size, must be treated the same. These remarks comport with the jury instructions, which provided that: "Your verdict must not be based upon speculation, prejudice, or sympathy. Each party, whether a corporation or an individual, should receive your same fair consideration." We cannot say that this runs afoul of the *in limine* rulings, especially where the remarks are in accordance with the jury instructions and did not introduce an improper element into the case.

¶ 100   Because we can find no impropriety in the challenged remarks, plaintiff cannot show that substantial prejudice resulted therefrom and there is no reversible error. See *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84 (reversal is only required where the improper comments resulted in substantial prejudice that altered the outcome of the trial). Furthermore, plaintiff cannot show prejudice where the jury found in her favor. See *McHale*, 2015 IL App (1st) 132625, ¶ 34

(references to a party's corporate wealth may be improper but is not reversible error if it appears no actual prejudice resulted therefrom).

¶ 101                              E. Violation of the Confidentiality Act

¶ 102   Finally, plaintiff argues that defendants elicited improper testimony from Schevers regarding plaintiff's mental health care where plaintiff did not waive her statutory privilege pursuant to *Reda v. Advocate Health Care*, 199 Ill. 2d 47 (2002), and section 10(a) of the Confidentiality Act (740 ILCS 110/10(a) (West 2024)). Plaintiff requests a new trial on damages due to the trial court's evidentiary error failing to cure this improper testimony. In response, defendants contend that the Confidentiality Act does not apply in this case and, in any case, it was not violated. Specifically, defendants assert that the statute does not apply because Schevers was not plaintiff's therapist and no records or communications related to plaintiff's mental health care were divulged.

¶ 103   As stated, we review a trial court's decision to grant or deny a motion for a new trial for abuse of discretion. *North Spaulding Condominium Association v. Cavanaugh*, 2017 IL App (1st) 160870, ¶ 30. A trial court's evidentiary rulings will also not be reversed absent a clear abuse of discretion. *Id.* However, because resolution of this issue requires statutory interpretation, our review is *de novo*. *Cinkus*, 228 Ill. 2d at 211; see *Sparger v. Yamini*, 2019 IL App (1st) 180566, ¶ 16 ("The applicability of a statutory evidentiary privilege, and any exceptions thereto, are matters of law subject to *de novo* review.").

¶ 104   Under *Reda*, the statutory privilege set forth in the Confidentiality Act can only be waived where the "recipient" of mental health services introduces his or her mental condition into the proceeding. *Reda*, 199 Ill. 2d at 59. Plaintiff claims she did not waive her statutory privilege, and defendants violated the Confidentiality Act by eliciting testimony from Schevers regarding

plaintiff's mental health. We must first determine, however, whether the statutory privilege was implicated under these circumstances.

¶ 105    Section 10(a) of the Confidentiality Act provides: "Except as provided herein, in any civil, criminal, administrative, or legislative proceeding *** a recipient, and a therapist on behalf and in the interest of a recipient, has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications." 740 ILCS 110/10(a) (West 2024). The Confidentiality Act defines "therapist" as "a psychiatrist, physician, psychologist, social worker, or nurse providing mental health *** services or any other person not prohibited by law from providing such services[,]" and defines "recipient" as "a person who is receiving or has received mental health *** services." 740 ILCS 110/2. Additionally, " '[r]ecord' means any record kept by a therapist or by an agency in the course of providing mental health *** service to a recipient concerning the recipient and the services provided." *Id.* "Communications" refers to "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health *** services to a recipient" and "includes information which indicates that a person is a recipient." *Id.*

¶ 106    "The legislative intent of a statute is best determined from the plain and ordinary meaning of the statutory language." *Reda*, 199 Ill. 2d at 55. Where the intent is clear from the statute's plain language, the court must limit its inquiry to that language and must not utilize extrinsic aids. *Id.* "Where the language is clear and unambiguous, we must apply it as written." *Id.*

¶ 107    The plain language of the statute clearly indicates that the privilege only applies to records or communications maintained by the recipient's therapist. Here, Schevers unequivocally testified that, although she is a licensed clinical counselor, she did not provide any counseling to plaintiff, as that was not her "role." She also testified on cross-examination that she provided a referral to

plaintiff but did not know anything further and "because of all the privacy laws, I left it there." None of these statements constitute either a record or a communication under the Confidentiality Act's definitions where Schevers was not plaintiff's therapist, did not provide any mental health services to plaintiff, and did not confirm or deny whether plaintiff was a recipient of any services.

¶ 108    In determining the legislature's intent, a reviewing court may consider, in addition to the statutory language, "the reason and necessity for the law, the evils sought to be remedied and the statute's ultimate aim." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 21. The purpose of the Confidentiality Act provides additional support for our conclusion here. Our supreme court has stated that the purpose of section 10(a) "is to preserve the confidentiality of the records and communications of persons who are receiving or who have received mental-health services" and this privilege "encourages complete candor between patient and therapist[.]" *Johnston v. Weil*, 241 Ill. 2d 169, 182 (2011). The court continued, stating that "where a person makes statements to a therapist in the course of a professional consultation, those statements are privileged." *Id.* at 183; see *Doe v. Burke Wise Morrissey & Kaveny, LLC*, 2023 IL 129097, ¶ 51 ("protections under the [Confidentiality] Act are contingent upon whether the communications or records that were disclosed were made in the course of providing therapy or other mental health *** services"). Additionally, this court found that the 1976 report which introduced the Confidentiality Act stated that "it was intended to include all those persons entering into a therapeutic relationship with clients." *Martino v. Family Service Agency of Adams County*, 112 Ill. App. 3d 593, 599-600 (1982).

¶ 109    Applying the privilege under these circumstances would not serve the intended purposes of the Confidentiality Act because plaintiff and Schevers had not entered into a therapeutic relationship and Schevers had not agreed to provide plaintiff with mental health services. Further,

based on the testimony, there was no reason for plaintiff to believe that any communications with Schevers would be privileged information where it was not a professional consultation but, rather, a conversation with a family friend who then made a referral to a counselor. Thus, section 10(a) is simply inapplicable here. See *Johnston*, 241 Ill. 2d at 184 (where the psychiatrist and the plaintiff "were not engaged in a therapeutic relationship," the Act did not apply).

¶ 110 Finally, we reject plaintiff's argument that the trial court's curative question was insufficient and did not resolve the issue. Plaintiff's counsel suggested that plaintiff be asked whether she had sought counseling to cure the alleged error, and the trial court agreed, finding that the proposed question "was adequate" to resolve any claimed error. The doctrine of invited error "prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error." *Gaffney v. Board of Trustees of Orland Fire Protection District*, 2012 IL 110012, ¶ 33. Plaintiff cannot now complain of the trial court's choice of resolution for the issue. Therefore, we conclude that the elicited testimony from Schevers and the court's curative question did not constitute error.

¶ 111                                        III. CONCLUSION

¶ 112   For the reasons stated, we affirm the judgment of the circuit court.

¶ 113   Affirmed.